# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**UNITED STATES OF AMERICA,**
        **Plaintiff,**

***vs.***                              **CRIMINAL ACTION NO. 1:08cr77**

**DARRIC SWEENEY,**
        **Defendant.**

## REPORT AND RECOMMENDATION/OPINION DENYING MOTION TO SUPPRESS

On the 22nd day of October 2008, Defendant, Darric Sweeney, through counsel, L. Richard Walker, filed a Motion to Suppress [Docket Entry 25]. On October 29, 2008, the United States Attorney, through his Assistant United States Attorney, David J. Perri, filed a Response to Defendant's Motion [Docket Entry 30]. On October 31, 2008, the matter was referred to the undersigned United States Magistrate Judge by United States District Judge Irene M. Keeley [Docket Entry 31]. The hearing on pre-trial motions was originally scheduled for October 28, 2008, but was continued by Order of the Court on motion by Defendant. On November 4, 2008, came the Defendant, Darric Sweeney, in person, and by his counsel, L. Richard Walker, and also came the United States by its Assistant United States Attorney, David J. Perri, for hearing on Defendant's Motion to Suppress.

### Procedural History

Defendant Darric Sweeney was indicted by a grand jury attending the United States District Court for the Northern District of West Virginia on September 4, 2008. The one-count indictment charges Defendant with knowingly possessing material, that is, a computer disk and other material containing images of child pornography that had been shipped and transported in interstate and foreign commerce, in violation of Title 18, United States Code, Section 2252A(a)(5)(B), (b)(2), and

also includes a forfeiture count.

Defendant was arraigned and pled "not guilty" on September 29, 2008.

**Contentions of the Parties**

Defendant generally contends:

1) The search warrant violates the Fourth Amendment because the affidavit in support of the issuance of the search warrant does not establish probable cause;

2) The affidavit failed to comment upon whether generally Mellisa Arbogast was a solid, reliable informant;

3) Any reasonable officer would have done at least something to confirm the claims of Ms. Arbogast prior to making an application for a search warrant; and

4) No judicial officer should have granted permission to invade the Defendant's home merely because Ms. Arbogast said there was something unlawful inside.


The United States contends:

1) The facts and circumstances surrounding the disclosure of first hand information by a witness with knowledge [Mellisa Arbogast] provided a basis for belief that the witness was reliable and credible.

2) The information provided by the witness amply supported a finding of probable cause.

3) The officers in this case did all that could have been expected under the circumstances, and they reasonably relied on the validity of the duly authorized warrant in good faith. See United States v. Leon, 468 U.S. 897 (1983).

## The Legal Standard

"The right to privacy in one's home is a most important interest protected by the Fourth Amendment and a continuing theme in constitutional jurisprudence." United States v. Wilhelm, 80 F.3d 116 (4th Cir. 1996). "Physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." Payton v. New York, 445 U.S. 573, 585, 100 S.Ct. 1371, 1379, 63 L.Ed.2d 639 (1980) quoting United States v. United States District Court, 407 U.S. 297, 313, 92 S.Ct. 2125, 2135, 32 L.Ed.2d 752 (1972). "At the very core [of the Fourth Amendment] stands the right of a man to retreat into his home and there be free from unreasonable government intrusion." Silverman v. United States, 365 U.S. 505, 511, 81 S.Ct. 679, 682, 5 L.Ed.2d 734 (1961).

The Fourth Amendment to the Constitution of the United States provides: "The right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the person or things to be seized." There is probable cause to search a home if there is a fair probability that evidence of a crime is located within the residence. See United States v. Murphy, 241 F.3d 447, 457 (6th Cir. 2001). Whether probable cause exists must be determined "under the totality of the circumstances." See Illinois v. Gates, 462 U.S. 213 (1983).

In a review of an issued search warrant, "great deference" is given to the issuing judicial officer's probable cause determination. United States v. Blackwood, 913 F.2d139, 142 (4th Cir. 1990). The test on review is whether there is substantial evidence in the record supporting the [judicial officer's] decision to issue the warrant. Massachusetts v. Upton, 466 U.S. 727, 728 (1984). To that end, the reviewing court does not conduct a *de novo* review but instead limits itself to the

information presented to the judicial officer who issued the warrant.  Id.  See also United States v. Wilhelm, 80 F. 3d. 116, 118 (4th Cir. 1996).

The determination of whether West Virginia Circuit Court Judge Moats had probable cause to issue the warrant to search is made by answering the question: From a totality of the circumstances presented to the issuing judge, was there "a fair probability that contraband or evidence of a crime" would be found in Darric Sweeney's residence?  Illinois v. Gates, 462 U.S. 213, 238 (1983).

## The Affidavit in Support of Search Warrant

Defendant attached to his Motion the Search Warrant and Affidavit in Support of Search Warrant.  The Affidavit in Support of Search Warrant, completed by Sgt. Dayton L. Mayle, Jr. on January 31, 2008,  provides as follows:

On Wednesday the 30th day of January, 2008 at or about 1045 hours Sgt. Dave Holcomb of the Grafton Police Department was telephonically contacted by Mellisa Arbogast.  Ms. Arbogast stated that Darric Sweeney had child pornography on his computers in his room.  Sgt. Dave Holcomb arranged for an interview to occur at her residence in Doddridge County.

On Thursday the 31st day of January, 2008 at or about 1045 hours Sgt. Dave Holcomb and the undersigned officer arrived at Mellisa Arbogast's residence in Sedalia Community.  Ms. Arbogast stated that she had been dating Darric Sweeney for a year and a half.  Ms. Arbogast stated that she lived with Darric Sweeney for approximately a month and a half.  Ms. Arbogast stated that while "snooping" around on Darric Sweeney's computer she discovered a file named Norp.

While checking the content of the file she discovered several movies which had been down loaded to Darric Sweeney's computer.  Ms. Arbogast stated she observed at least 10 videos with small children ages ranging from 3 years of age to young teenagers.  The videos depicted these children having sexual relations with other children as well as adults.  Ms. Arbogast stated that the sexual acts varied from oral sex with adults to penetration of the vagina.

Ms. Arbogast stated that she stayed with Darric Sweeney from the 4th of January, 2008 to the 10th of January, 2008.  During this time Ms. Arbogast stated that she and Darric Sweeney watched several of the videos involving child pornography together.

4

Ms. Arbogast stated that Darric Sweeney requested that she perform oral sex on him while he would watch the child pornography.

Ms. Arbogast stated that the conversation would come up between her and Darric Sweeney, with Sweeney inquiring if she had ever preformed [sic] sexually related acts on her own children. Ms. Arbogast stated that Darric Sweeney told her that he would never touch one of her children with out her permission. Ms. Arbogast stated that this is when she made up her mind to break up with Darric Sweeney and to come forward and contact the Police.

Ms. Arbogast stated that she last saw child pornography on Darric Sweeney's computer on the 10th day of January 2008. Ms. Arbogast stated that she had watched these child pornographic videos on multiple occasions with Darric Sweeney. Ms. Arbogast stated that Darric Sweeney had multiple child pornographic videos on his computer. Ms. Arbogast stated that every time she witnessed the child pornography was in Darric Sweeney's room located in Darric Sweeney's mother's house on 316 Pearl St. in Grafton, Taylor County West Virginia.

To Ms. Arbogast's knowledge, Ms. Susan Sweeney is unaware of any of these illegal activities. Ms. Arbogast states that Darric Sweeney has 2 computers and "lots" of computer components in his room. The undersigned officer is requesting a no knock search warrant on the basis that files on computers is [sic] easily and quickly destroyed from the computer. The undersigned officer is afraid that if entry into the residence is delayed that valuable evidence of the child pornography crime will be destroyed.

Circuit Judge Moats issued the Search Warrant.

### Testimony

Grafton City Police Sgt. Dave Holcomb testified that he has been with the Grafton Police department for 14 years, currently assigned to the multi-disciplinary task force, a child abuse and neglect task force. He received a message to get in touch with Mellisa Arbogast – that she wanted to talk to someone about some videos. He did not know Ms. Arbogast. He had never met her before and knew nothing about her. He called Ms. Arbogast. She seemed hesitant and afraid, but told him she had some information. Finally she shared that she had seen some videos. Sgt. Holcomb arranged to meet Ms. Arbogast at her residence the next day.

Sgt. Holcomb contacted Sgt. Mayle, and made arrangements for the two to meet Arbogast the following day. Sgt. Mayle was also assigned to the MDT. He told Sgt. Mayle he had a report of "another child pornography case" and that they should look into it. Ms. Arbogast was living at her mother's home in Sedalia, Doddridge County, West Virginia. She had given the officers directions but the home was still very hard to find. When they arrived at the house, they saw Ms. Arbogast's mother leaving, and a young boy in the living room watching cartoons and playing a video game. They introduced themselves to Arbogast. Neither officer had ever been to the home before, and neither had ever met Arbogast before.

Sgt. Holcomb testified that Ms. Arbogast told them that she had been at Defendant's mother's house in Grafton. Sgt. Holcomb testified he knew Defendant and Defendant's mother, and knew exactly which house Ms. Arbogast meant. Defendant grew up in Grafton and law enforcement had dealt with him on occasion. On one occasion, Defendant had taken his mother's car and was caught drunk driving. Sgt. Holcomb could not recall if that incident was before or after he met with Ms. Arbogast.

The officers and Arbogast sat at the dining room table. Arbogast seemed to Sgt. Holcomb to be "a little bit reluctant." She told him she was afraid, and to him she seemed scared. Her demeanor was nervous and scared, but he understood that could be because she was talking to police about a serious matter. She told the officers she had been staying at Defendant's mother's house on Pearl Street. He did not recall if she actually gave the address, because he already knew exactly where the house was. Sgt. Holcomb testified that Arbogast told them she had been seeing Defendant for about a year and a half. She had been living with Defendant, in his mother's house, for a few weeks. She had been "snooping" on his computer, checking to see if he was contacting any other

women. Under "My Docs" or "My Computer" on Defendant's computer, she found a file called "My Ebooks" which contained still images and videos of children performing oral sex on adults, children having sex with other children, and children involved in incest.

Sgt. Holcomb testified that Ms. Arbogast told them she did not confront Defendant right away, but when she did, he told her "it [the child pornography] came along with some other porn and he likede it and ordered more." Ms. Arbogast told Sgt. Holcomb she then lied to Defendant and told him she was interested, too, "just to see how far he'd go." Ms. Arbogast described the images and activity she saw on the computer in great detail with great specificity. Ms. Arbogast described one still image that "rang home" with the officer, who testified he had seen it before in two other child pornography cases in this jurisdiction [the "Vannoy" case and the "Cameron" case]. The image was of a little blond-haired girl performing oral sex on an adult male in a bathtub. Sgt. Holcomb testified that the fact that Arbogast described the image that he recognized, made him know she had actually seen it. He knew it existed. In fact, Sgt. Holcomb testified, when Defendant turned his computer on for the officers pursuant to the search, that image was the first to come up on his computer.

When asked why he did not put all of that information in his affidavit in support of search warrant, Sgt. Holcomb testified that they did not go into the "despicable details of each scene." The familiar image just gave him the impression that this incident was connected with others in Taylor County. He did not break down the images of child pornography in the affidavit.

Sgt. Holcomb testified that the officers told Ms. Arbogast that it was "always possible" that she could be implicated in a crime, and asked if she was aware of that– that, since she saw it and watched it, she could be implicated. Ms. Arbogast said she was aware of that possibility. She then stated that after talking to Defendant about her own children, she decided to leave him, but lied to

him, telling him she needed to go back home and back to school. She did not tell him she was leaving because of the child pornography and fear for her children.

Sgt. Holcomb testified that his only concern at that point was to validate whether "stuff" was on the computer. He could not say how a "normal, honest person" would have or should have reacted to seeing the child pornography on another person's computer. He would just investigate and do what needed to be done. When asked if he believed what Ms. Arbogast had done was abnormal or wrong, Sgt. Holcomb testified that he couldn't really say, morally, but he had advised her that her acts could be considered criminal. He made her aware that because she watched the images, both with and without Defendant, it could be interpreted that she was involved. She still did not change her story. He believed she thought it was so important that she would share the information even if it did put her under suspicion. Although he did not expressly , affirmatively say so in the affidavit, Sgt. Holcomb testified he believed Arbogast's story was true.

Sgt. Holcomb testified that the officers did no further investigation at Ms. Arbogast's house. After they left her house, they believed they had enough for an affidavit for probable cause for a search warrant. Although he was present when the affidavit was drafted, Sgt. Holcomb did not draft it– Sgt. Mayle did. Sgt. Mayle "typed it up" at Sgt. Holcomb's office. The two performed no further investigation before bringing the affidavit and search warrant to the county prosecutor's office. The County Prosecutor, John Bord, reviewed the affidavit, then asked the officers if they had everything they needed. When they responded in the affirmative he made arrangements for all three to go before Circuit Judge Alan Moats. Mr. Bord made no comments or criticisms regarding the affidavit. He did not suggest any changes or additions. He did not suggest any further investigation. He just said to wait for the Judge. The officers did no further investigation. They did not talk to any other

witnesses. They did no surveillance and did not do a "trash pull." They did not learn anything more about Ms. Arbogast. Neither had ever met her before. They were not aware of any prior contact with police, although Sgt. Holcomb testified he found out quite some time after the search, that Ms. Arbogast was also being looked into as a victim of a sex crime. He did not inquire into her previous history, and did not ask if she had ever perjured herself or lied.

Sgt. Holcomb then testified that he, Sgt. Mayle, and Mr. Bord went into see Judge Moats in his office. The Judge requested and was given the case file, including Arbogast's signed statement and the affidavit. He reviewed the affidavit and looked at Ms. Arbogast's statement, then questioned the officers "very thoroughly" about certain images. He asked a lot of questions. The officers told Judge Moats that they believed Ms. Arbogast was credible especially based on the image she described which they had actually seen before. During this meeting there was no court reporter, law clerk, or secretary in Judge Moats' office, and no recording was made of the discussion.

Judge Moats then explained exactly how he wanted the search warrant executed.

Upon cross examination, Sgt. Holcomb explained that Ms. Arbogast' written statement was in question and answer form, and in his handwriting. She had signed the bottom of each page. In the statement Ms. Arbogast gave her name, race, sex, date of birth, social security number, address and phone number as well as a physical description of herself. She was not hesitant to provide any of these identifiers, although initially she said she was afraid of Defendant. Her statement said she was afraid–"I worried about him molesting a child. I'm afraid of him." Sgt. Holcomb's impression of Ms. Arbogast was that she was a "concerned citizen" and an "eyewitness to a crime." She was not considered an "informant." Sgt. Holcomb testified he was satisfied with the level of detail Ms. Arbogast provided regarding what she had seen, and was satisfied that the basis of her knowledge

was her being an eyewitness. There was nothing in her manner that caused him to doubt her credibility , reliability or motive. It was apparent to him that Ms. Arbogast knew what she was talking about. She said, and he believed, that she observed the child pornography while residing with Defendant at his mother's house, in his bedroom in the attic. The fact that she was willing to meet the officers in person and provide personal information that was at the least embarrassing made him understand she must have thought it important because the information was "humiliating" to her, herself. He also knew that, if any of Ms. Arbogast's information had turned out to be untrue, it would have been "absolutely" easy to find her. The officers knew where she lived and had all her identifying information.

On redirect, Sgt. Holcomb testified that he did presume that Ms. Arbogast was a drug user, based simply upon the fact that she had a relationship with Defendant. He understood that drug abuse could affect a person's credibility. He testified, however, that there was no indication of Ms. Arbogast being under the influence of anything at the time the officers met with her. He did agree with counsel for Defendant that "there must have been something wrong in the relationship for her to "'snoop around.'" That, to him, suggested some type of problem in their relationship.

On the other hand, Sgt. Holcomb testified that, to him, the fact that Ms. Arbogast shared the information regarding her own complicity boosted her credibility. Counsel countered: "wouldn't participation in a felony affect credibility?" To which Sgt. Holcomb responded that it would depend. He also agreed that Ms. Arbogast admitted she had lied to the defendant twice– once when she said she enjoyed the child pornography "to see how far he'd go," and then again when she told him she was leaving "because she had to go home and go back to school." Counsel asked Sgt. Holcomb, wouldn't the fact that Ms. Arbogast was a "two-time liar, drug addict, and felon" affect her

credibility to some degree? He replied that it could, but not necessarily. Sgt. Holcomb did not tell Judge Moats he assumed Mr. Arbogast used drugs because she associated with Darric Sweeney. Nor did Sgt. Holcomb tell the Judge that there may have been problems in Ms. Arbogast's and Defendant's relationship that could have created a motive for her to lie. Sgt. Holcomb testified that the Judge read her statement and the affidavit. In his testimony, Sgt. Holcomb surmised the Judge could have made the same assumption regarding the "snooping."

Taylor County Sheriff's Department Sgt. Mayle testified he was also a member of the MDT, investigating child abuse and sex crimes. He was paired up with Sgt. Holcomb for serious offenses. Sgt. Holcomb called him and said that a Mellisa Arbogast had called and said she witnessed some child pornography at Defendant's residence in Grafton. She said she would meet the officers "someplace in Sedalia." Sgt. Mayle testified he knows Defendant "real well" from the "law community" and from knowing his parents. He did not know Ms. Arbogast at all and did not know anything about her.

The two officers drove to Sedalia, in Doddridge County. They went in Arbogast's house and saw her mother leaving, and a small child playing a hand-held video game in the living room area. He saw no evidence of any criminal activity going on in the residence. He noted only that Ms Arbogast was very thin. He testified she definitely appeared scared. The two officers played roles of "nice guy/bad guy," something he said they normally did. Sgt. Mayle played the "bad guy." He told Arbogast if she lied to them she could go to jail. He also told her she was implicating herself in a crime. When asked why that was not in the affidavit, Sgt. Mayle said it was just an omission. They did not tell her she needed a lawyer and did not Mirandize her. She conversed with Sgt. Holcomb while he watched. He did not take notes.

11

Sgt. Mayle testified that Ms. Arbogast said she dated Defendant for awhile then lived with him a short period of time. She said she was "snooping" on Defendant's computer and came upon a file called "NORP." She saw images and videos of children having sex with other children and with adults. She told them that she later talked to Defendant about what she had seen. Even later, she and Defendant watched the child pornography together and had sex while watching. Ms. Arbogast described the images she saw on Defendant's computer. Sgt. Mayle testified that the one that stuck in his mind was of a little blonde-headed child performing oral sex on an adult in the bathtub. He had seen that image before in other child pornography cases. She also described videos of siblings having sex, children having sex with other children, and children having sex with adults.

Sgt. Mayle testified that Ms. Arbogast told them she was "terrified" Defendant would harm her because she was telling on him. Sgt. Holcomb told her if she ever felt threatened by Defendant, she should call 911, then them.

Sgt. Mayle testified that Ms. Arbogast described Defendant's upstairs bedroom. He suspected she was a drug addict based only on her having a relationship with Defendant. He never learned what she did for a living, if anything. He said he honestly believed she was receiving government assistance of some sort. Only after Defendant's arrest did he learn more about Ms. Arbogast. He also assumed there must have been a problem with Ms. Arbogast's relationship with Defendant , but only because she contacted them -- there was no history of any domestic assaults or anything of that nature in the relationship that he knew of.

Sgt. Mayle testified that in his county the officers were required to see the county prosecutor before they could see the Circuit Judge. They went to John Bord and told him what had happened.

Mr. Bord then took them to see Judge Moats. He did not say to change or add anything in the affidavit. He said it was fine. In other cases, the prosecutor had asked for changes, and those changes were "absolutely" made. In this case, he did not ask for any changes or corrections.

The officers and Mr. Bord then went in to see Judge Moats together. They gave him the statement and described the images. They then described to the Judge what Ms. Arbogast had described to them. They told the Judge about the specific picture they had both recognized. Sgt. Mayle testified that the fact that this information was not in his affidavit was an oversight. Judge Moats asked for the file, and they gave him the file. They told him that they had told Ms. Arbogast she could be found to have committed a crime. They told him they believed she was being honest.

Judge Moats did not suggest any changes or corrections. Sgt. Mayle testified he believed the Judge would have directed him to make changes or corrections or additions had he seen the need for any. Sgt. Mayle believed this meant that the affidavit was fine. He himself was satisfied with the level of detail provided by Ms. Arbogast and the basis of her knowledge. He had been watching Ms. Arbogast while Sgt. Holcomb questioned her, and he saw nothing in her body language that seemed deceptive. She seemed honest and open to him. There was "not a doubt in his mind" that what Ms. Arbogast told the officers was the truth. When asked why they did not investigate further, Sgt. Mayle testified that he knew of no other way to investigate a child pornography case. He could ask no other people, he would expect no other witnesses (unlike in a drug case.). He testified he knew of no other way to go about this investigation.

Sgt. Mayle testified that he completed the affidavit. He handed it to the prosecutor. The prosecutor handed it back to him. Sgt. Mayle then handed it to the Circuit Judge. He was asked by the Circuit Judge to swear to the information contained in the affidavit. Judge Moats asked some

questions and read the affidavit. The procedure was the same as it had been every time he had been before Judge Moats, since 1999.

Judge Moats signed the warrant. He then gave the officers specific instructions as to how the warrant was to be served. They were not to enter the house until Defendant's mother was home. They were to be very respectful and professional at all times.

Defendant then called Mellisa Arbogast as a witness. The Government objected on the basis of relevance, arguing that the sole issue before the Court was whether the search warrant was defective in not being supported by probable cause. The affidavit provided the probable cause, and Defendant made no <u>Franks</u> allegation.

Defendant argued he needed Ms. Arbogast's testimony to establish that the information the police officers had was incomplete.

Upon consideration of all which, and for reasons stated on the record, the Court sustained the Government's objection and disallowed Ms. Arbogast's testimony for purposes of this proceeding. The Court advised that it would consider the totality of the circumstances as presented to Judge Moats by Sgt. Mayle and Sgt. Holcomb. Ms. Arbogast was not a part of that discussion. Further, the Court would not consider information outside the record which was not sworn and was not recorded. Counsel for Defendant then proffered that he had been informed that Ms. Arbogast had a serious drug addition problem. He was informed that she had previously made false allegations against Defendant to the Grafton Police Department; that she falsely implicated Defendant in a sex assault case; and had prior arrests for public intoxication. He further had information that Ms. Arbogast suffered from bipolar disorder– a mental illness. Finally, Counsel for Defendant proffered that Ms. Arbogast did not leave Defendant because of the child pornography.

14

Instead, Defendant broke off the relationship because Ms. Arbogast had given him a venereal disease, by which he knew she was having sex with other men.

Upon consideration of all which, the Court concluded: 1) No officer had any knowledge of any such information regarding Ms. Arbogast at the time the search warrant was sought; 2) The information the officers gave Judge Moats was the only information material to the motion to suppress; and 3) Ms. Arbogast's history, if any, was not material because the officers were not aware of that history and Judge Moats was not presented with that history.

### Discussion

### Probable Cause

Defendant argues that the affidavit in support of the search warrant did not support a finding of probable cause. First, he argues, Ms. Arbogast's statements to the police were not sworn and were nor credible because: "[b]y her own admission Ms. Arbogast knowingly possessed child pornography while with the Defendant at this home and Ms. Arbogast engaged in sexual acts while viewing the child pornography." Further, "Ms. Arbogast was a far cry from an ordinary, honest, and good citizen who tried to do the correct thing by contacting the police. To the contrary she was an accomplice, which, by nature, seriously undercut her credibility. And it appears that after she ended her relationship with the Defendant, she failed to report the existence of child pornography to police for over two weeks, which is inconsistent with her suggestion set forth in the affidavit that the Defendant might be a danger to her own children." Finally, Defendant argues that the affidavit itself failed to comment upon whether Arbogast was a solid informant, citing U.S. v. Wilhelm, 80 F.3d 116 (4th Cir. 1996), and the officers did not corroborate her statements.

Defendant concludes: "The bottom line is that any reasonable officer would have done at

least something to confirm the claims of Ms. Arbogast prior to making an application for a search warrant. Likewise, the Defendant contends that no judicial officer should have granted permission to invade the Defendant's home merely because Ms. Arbogast said there was something unlawful inside."

An affidavit in support of a search warrant may be based in whole or in part on hearsay information so long as there are sufficient indicia of reliability. See, e.g., United States v Ventresca, 380 U.S. 102, 103 (1965).

The United States concedes that the affidavit in this case does not expressly address the credibility or reliability of Ms. Arbogast. However, "[r]eliability may be inferred from factual circumstances, even if an affidavit otherwise fails to assert it," citing United States v. Perez, 393 F.3d 457 (4th Cir. 2004); United States v. Miller, 925 F.2d 695 (4th Cir. 1991)(reliability of informant's information may be inferred from factual circumstances, even if affidavit fails to assert expressly the informant's reliability) and United States v. Blackwood, 913 F.2d 139, 142 (4th Cir 1990). Significant to this case, is the fact that the informant, Ms. Arbogast, is admitting to a crime or providing information in hope of leniency for past crimes is "indicia of reliability" of the information provided. United States v. Harris, 403 U.S. 573,(1971); United States v. Miller, 925 F.2d 695, 698 (4th Cir. 1991).

In 1983, the Supreme Court abandoned its prior "two-pronged test" for assessing reliability of informant information in favor of a "totality of the circumstances" test. Illinois v. Gates, 462 U.S. 213 (1983). Since then it has been the rare case in which the Fourth Circuit has found a search warrant based on an informant tip to be inadequate, particularly where the information has been corroborated. See e.g., United States v. Hodge, 354 F.3d 305(4th Cir. 2004); United States v. Lalor,

996 F.2d 1578 (4th Cir. 1993).

The undersigned finds there was sufficient indicia of the reliability of Ms. Arbogast's statements to police for Judge Moats to find probable cause to issue the search warrant.

Ms. Arbogast was certainly not an anonymous tipster. She first called police and then volunteered to meet them face to face. She gave her name, age, date of birth, social security number, home phone number, height, weight, hair and eye color. Ms. Arbogast stated she actually lived with the defendant, and she herself viewed the child pornography on his computer. She knew the address of the residence and that Defendant's mother lived there. She described where the computer was, in Defendant's bedroom in the attic. She also stated she believed Defendant's mother knew nothing about the child pornography. If any of the information Ms. Arbogast provided to police had been inaccurate, the police could have easily found and prosecuted her for falsifying a report to law enforcement. In fact, she was warned about supplying false information to the police.

Instead of Ms. Arbogast's original complicity in watching child pornography making her less reliable, the undersigned finds her admission to doing so makes her more reliable. She faced risks in informing the police about her own activities. She could have been prosecuted herself for the same crime, or the police could have reported her confessed activities to the Department of Health and Human Services, raising at least a possibility of her children being taken away.

The Court finds that neither of the officers in this case had any knowledge of Ms. Arbogast's history as proffered by counsel. Accordingly, no information or speculation as to Ms. Arbogast's history was provided to the Circuit Judge. The Court therefore finds Ms. Arbogast's taking the stand for defense counsel to conduct a fishing expedition relative to her past history is not relevant or material to the issues being raised.

The undersigned finds that the totality of the circumstances that were submitted to Judge Moats by Sgt. Holcomb and Sgt. Mayle was the affidavit and Ms. Arbogast's statement. Ms. Arbogast was not part of the meeting between the Judge, the prosecutor and the officers. The affidavit was sworn to by Sgt. Mayle. The affidavit is in evidence and is the totality of what the Court has to review to discover what Judge Moats depended on in issuing the search warrant. United States v. Wilhelm, 80 F.3d 116, 118 (4th Cir. 1996) stating: "When reviewing the probable cause supporting a warrant, a reviewing court must consider only the information presented to the magistrate who issued the warrant." "[T]he validity of a search warrant obtained by state officers is to be tested by the requirements of the Fourth Amendment of the U.S. Constitution, not by state law standards, when the admissibility of evidence in federal court is at issue." United States v. Clyburn, 24 F.3d 613, 616 (4th Cir. 1994)(holding a search warrant supported by affidavit and sworn, unrecorded oral statements is sufficient notwithstanding Defendant's Rule 41 and state law arguments). In the instant case, it is unclear from the evidence whether the oral statements of the officers were made before or after the Circuit Judge placed him under oath. It appears from the evidence that the Circuit Judge may have placed the officer (Mayle) under oath near the conclusion of the process and after he had reviewed the officer's file materials and affidavit but just before he had the officer swear to the affidavit and sign the same. For that reason the affidavit is the focus of the probable cause determination in this case. For that reason, this Court did not consider Ms. Arbogast's written statement even though it was presented to the Circuit Court Judge as part of the officer's investigative file. On its face it was not sworn to and there is no evidence it was sworn to during the Circuit Court Judge's probable cause determination.

In United States v. Blackwood, 913 F.2d 139, 142 (4th Cir.1990),the Fourth Circuit held that

the probable cause determination made by the magistrate judge should be accorded "great deference." Here, the undersigned shows great deference to the probable cause determination made by Circuit Judge Moats, and finds there was probable cause to issue the search warrant.

## <u>Leon</u> Exception

The undersigned Magistrate Judge finds that, even if the information in the affidavit were found to be insufficient for a finding of probable cause to issue a search warrant (which the Court does not ), the evidence seized in the search should not be suppressed pursuant to the "good faith exception" stated in <u>U.S. v. Leon</u>, 468 U.S. 897, 104 S. Ct. 3405, 82 L. Ed. 677 (1984).

The United States Supreme Court has held that the exclusionary rule operates as "a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved." <u>United States v. Calandra</u>, 414 U.S. 338, 94 S. Ct. 613, 38 L. Ed. 2d 561 (1974). In <u>Leon</u>, the Supreme Court explained the reason for rule:

> First, the exclusionary rule is designed to deter police misconduct rather than to punish the errors of judges and magistrates. Second, there exists no evidence suggesting that judges and magistrates are inclined to ignore or subvert the Fourth Amendment or that lawlessness among these actors requires application of the extreme sanction of exclusion. Third, and most important, we discern no basis, and are offered none, for believing that exclusion of evidence seized pursuant to a warrant will have a significant deterrent effect on the issuing judge or magistrate.

<u>Leon</u> at 915, 104 S. Ct. at 3417. Further:

> If the purpose of the exclusionary rule is to deter unlawful police conduct, then evidence obtained from a search should be suppressed only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment.

<u>Id.</u> at 918, 104 S. Ct. 3 at 3419. The Supreme Court concluded:

> [T]he marginal or nonexistent benefits produced by suppressing evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant cannot justify the substantial costs of exclusion.

Id. at 922, 104 S. Ct. at 3420. Therefore, the question of whether the good faith exception to the exclusionary rule should be applied to suppress evidence, depends on whether suppression of the evidence would have the desired effect of deterring police misconduct. In most cases, "when an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope . . . . there is no police illegality and thus nothing to deter." Id. at 920-21, 104 S. Ct. at 3419.

The Fourth Circuit followed the Supreme Court's line of reasoning in United States v. Lalor:

> Under the good faith exception to the warrant requirement, evidence obtained from an invalidated search warrant will be suppressed only if the officers were dishonest or reckless in preparing their affidavit or could not have harbored an objectively reasonable belief in the existence of probable cause.

996 F.2d 1578 (4th Cir. 1993). Accord United States v. Bynum, 293 F.3d 192, 197-199 (4th Cir. 2002) (applying good faith exception where "affidavit contained sufficient indicia of probable cause so as not to render reliance on it totally unreasonable," reversing district court's suppression of evidence); and United States v. Cluchette, 24 F.3d 577 (4th Cir. 1994) (applying good faith exception to search warrant issued by state judge over telephone, declining to determine whether warrant was valid under state law.) In other words, the good faith exception applies unless "a reasonably well-trained officer . . . [should] have known that the search was illegal despite the magistrate's authorization." Leon, 468 U.S. at 922 n.23.

The Fourth Circuit has noted "four situations in which an officer's reliance on a search warrant would not be reasonable," and the good faith exception would therefore not apply:

(1) the magistrate was misled by information in an affidavit that the officer knew was false or would have known was false except for the officer's reckless disregard of the truth;
(2) the magistrate wholly abandoned his detached and neutral judicial role;
(3) the warrant was based on an affidavit that was so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and
(4) the warrant was so facially deficient, by failing to particularize the place to be searched or the things to be seized, that the executing officers cannot reasonably presume it to be valid.

United States v. Hyppolite, 65 F.3d 1151, 1156 (4th Cir. 1995), quoting Leon, 468 U.S. at 923.

In his Motion to Suppress Defendant argues that "[t]he bottom line is that any reasonable officer would have done at least something to confirm the claims of Ms. Arbogast prior to making an application for a search warrant. Likewise, the Defendant contends that no judicial officer should have granted permission to invade the Defendant's home merely because Ms. Arbogast said there was something unlawful inside." Defendant appears to be arguing that Leon should not apply, but does not expressly state which of the four situations supports his theory. He does not allege, nor is there any evidence to support an allegation that officers misled Judge Moats with information they knew was false or would have known was false but for their reckless disregard for the truth. Sgts. Holcomb and Mayle went to far as to ask Ms. Arbogast to meet them face to face after her phone call. They had her give a written statement. They warned her that not only false accusations, but even her own admissions in this matter could cause her problems. They both testified they found her credible.

After drafting the affidavit, they read it to the Taylor County Prosecutor. Consultation with the prosecutor prior to applying for the warrant provides evidence of the officers' objective good faith. Bynum, 293 F.2d at 198 (citing Leon.) The prosecutor approved the affidavit without asking for any changes, deletions, or additions. The prosecutor himself then made the arrangements for the

officers to see Circuit Judge Moats. The officers and Mr. Bord then took the affidavit to Circuit Judge Moats. Judge Moats was able to see in the affidavit that Ms. Arbogast was admitting to watching child pornography herself. He was able to see from the affidavit that she continued watching the child pornography and even had sex with Defendant while watching it. Defendant argues that the officers were aware, but did not inform Judge Moats, that they suspected Ms. Arbogast was probably a drug addict because she was affiliated with the Defendant. He also argues that the officers should have been aware, had they performed any reasonable investigation, that Ms. Arbogast was a drug addict, had a prior criminal history, had made false accusations against Defendant regarding a sexual assault, and had not broken up with him over the child pornography, but instead, Defendant had broken up with her after she gave him a venereal disease.

The undersigned United States Magistrate Judge finds the above information, would, at most, possibly form a basis for a <u>Franks</u> hearing. <u>See</u> <u>Franks v. Delaware</u>, 438 U.S. 154 (1978). So far, however, Defendant has not requested a <u>Franks</u> hearing, nor has he made "a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth was included by the affiant in the warrant affidavit." <u>Franks</u>, <u>supra</u>. Defendant has not provided <u>any</u> "false" statements from the affidavit. What he has provided, through proffer of counsel, is more akin to possible omissions from the affidavit– i.e., Ms. Arbogast was a drug addict; Ms. Arbogast and Defendant had relationship problems; Ms. Arbogast had a mental disorder; Ms. Arbogast had motive to lie about Defendant. First, there is no evidence the police officers knew any of these things, except they surmised she was a drug addict and they surmised the two had relationship problems. Judge Moats could have as easily surmised those two things from his own reading of the information in the affidavit. Any omissions must be material and intentional. The Fourth Circuit first applied

<u>Franks</u> to intentional, material omissions in <u>United States v. Colkley</u>, 899 F.2d 297 (4th Cir. 1990).

To successfully attack an affidavit based on omitted information, the defendant <u>must show</u>: (1) that the omission is the product of a deliberate falsehood, or of a reckless disregard for the truth, and (2) inclusion of the omitted information in the affidavit would defeat probable cause. <u>Id.</u> See <u>also</u> <u>Photogrammetric Data Services</u>, 259 F.3d at 237-38. However, as the Court noted in <u>Colkley</u>, all known exculpatory information need not be included in an affidavit, and omission of information is less likely to require a <u>Franks</u> hearing than is the knowing inclusion of false information.

The undersigned United States Magistrate Judge finds Judge Moats was not misled by information in an affidavit that officers Holcomb and Mayle knew was false or would have known was false except for their reckless disregard of the truth. <u>United States v. Hyppolite</u>, 65 F.3d 1151, 1156

There absolutely no evidence to support an allegation that Circuit Judge Moats "wholly abandoned his judicial role in the manner condemned in <u>Lo-Ji Sales, Inc. v. New York</u>, 442 U.S. 319 (1979)." <u>U.S. v. Leon</u>, 468 U.S. 897.

The undersigned has already found probable cause supported the issuance of the search warrant. To clarify for the purposes of <u>Leon</u> only, there is clearly no finding that the warrant was based on an affidavit that was so lacking in indicia of probable cause as to render official belief in its existence <u>entirely unreasonable</u>." <u>Id</u>. (Emphasis added). This is not a case of a "bare bones" affidavit, relying on anonymous informants.

> A "bare bones" affidavit is one in which an affiant merely recites the conclusions of others - - usually a confidential informant - - without corroboration or independent investigation of the facts alleged . . . . However, a 'bare bones' affidavit is not one with weak inferences, but rather one without facts from which a judge can determine probable cause.

United States v. Wilhelm, 80 F.3d 116 (4th Cir. 1996).  Here the affidavit names the individual who provided the information, Mellisa Arbogast.  It continues that Ms. Arbogast had lived with Defendant for approximately a month and a half.   She discovered the child pornography on Defendant's computer at his residence.  She watched several of the videos with Defendant, and even performed sexual acts while watching the videos.  As Defendant states, Ms. Arbogast "was a far cry from an ordinary, honest and good citizen who tried to do the correct thing by contacting the police." She did, however, try to do the correct thing for her children by contacting the police, after Defendant appeared to show a sexual interest in them.  The undersigned does not find this undermines her credibility.  Nor does the fact that she may have waited two weeks before contacting the police.  She had dated Defendant for 18 months, and lived with him from January 4th to January 8th, 2008..  It is not beyond the realm of possibility that she would have thought a long time about the decision to turn him in to police (and, in the act of doing so, also admit her own compliance).

Nor is there an indication in this case of any sort of bad faith by Sgts. Mayle or Holcomb. Sgt. Mayle did not "craftily choose his words in an attempt to clothe [his affidavit] with 'genuine substance.'" See U.S. v. Wilhelm, 80 F.3d 116 (4th Cir. 1996).  In Bynum, the Fourth Circuit noted:

> "There is nothing here to suggest that" Agent Peterson in any way "was dishonest." . . . . On the contrary, that Agent Peterson consulted with the prosecutor prior to applying for the search warrant provides additional evidence of his objective good faith, like the law enforcement officer in *Leon*, 468 U.S. at 902, 104 S.Ct. 3405, and unlike the officer in *Wilhelm* . . . .

293 F.3d at 198 (internal citations omitted).  As already stated, the undersigned finds Sgt. Mayle and Sgt. Holcomb completely credible.  Sgt. Holcomb  interviewed Ms. Arbogast by telephone and then he and Sgt. Mayle interviewed her in person.   They then consulted with the prosecuting attorney. As in Bynum, "this provides additional evidence of his objective good faith.   Leon." Id.

For all the above reasons, the undersigned does not find the officers' affidavit was so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.

Finally, there was some dispute over whether Ms. Arbogast provided the exact address of the place to be searched or whether the officers just knew the address when they were advised it was the residence in which Defendant lived with his mother. The undersigned finds the warrant was not deficient inasmuch as it specifically identifies a particularized place to be searched and the things to be seized, to wit: "Computer's Computer equipment capable of storing illegal child pornography, disks or other media capable of storing child pornography eg; SD cards, jump drives computer storage devices/drives and the like is concealed in 316 Pearl St. Grafton, WV. 26354 the home is owned by the suspects mother Susan Sweeney and is a 2 story wood framed house tan in color." Such particularized descriptions coupled with the issuing Judge's instructions not to execute the warrant until Ms. Sweeney, the mother was home and then to do so with respect satisfies the particularity requirement of the Fourth Amendment. In this case, it does not matter that the officers did or did not get the address from Ms. Arbogast. The officers knew exactly which house to search, and in which room they would find the computers containing the child pornography. All that matters is that the place to be searched was particularized in the warrant. Andresen v. Maryland, 427 U.S. 463, 480 (1976); Stanford v. Texas, 379 U.S. 476, 481-485 (1965); and United States v. Robinson, 275 F.3d 371, 381-382 (4th Cir. 2001), *cert. denied,* 535 U.S. 1006 (2002).

For all the above reasons, the undersigned finds the officers' reliance on the search warrant issued by Judge Moats was objectively reasonable. The good faith exception, therefore, renders the evidence seized in the search admissible even if, on review, probable cause is not found for the issuance of the warrant.

## RECOMMENDATION

For all the above reasons, the undersigned finds that the evidence seized pursuant to the search warrant in this case was all lawfully seized. As to all this evidence, therefore, the undersigned recommends Defendant's Motion to Suppress [Docket Entry 25] be **DENIED**.

Any party may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Irene M. Keeley, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such report and recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of the Court is directed to mail a copy of this Report and Recommendation to counsel of record.

Respectfully submitted this 10th day of November, 2008.

*John S. Kaull*
JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE